# UNITED STATES DISTRICT COURT
for the

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>One green Apple iPhone cellphone with<br>a clear and glitter MagSafe cellphone case | Case No. '22 MJ3948 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3, incorporated herein.

located in the  Southern  District of  California , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841, 846 | Possession of Fentanyl With Intent to Distribute and Conspiracy to do the same |
| 18 USC 2 | Aiding and Abetting |

The application is based on these facts:

See attached Affidavit of Federal Bureau of Investigation Special Agent Sean Bradley

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

FBI Special Agent Sean Bradley
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone *(specify reliable electronic means)*.

Date: 10/26/2022

*William V. Gallo*
*Judge's signature*

City and state: San Diego, CA         Hon. William V. Gallo, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A-3

## PROPERTY TO BE SEARCHED

The following property is to be searched:

One green Apple iPhone cellphone with a clear and glitter MagSafe cellphone case as depicted in the below photographs (**Target Device 3**)




Target Device 3 was seized from a white purse with Louis Vuitton markings located on the floorboard directly in front of the center console in a Dodge Ram bearing Texas license plate RXK8260 on September 28, 2022. It is currently in the custody of the San Diego County Sheriff's Department Lakeside Station at 12365 Parkside Street, Lakeside, California 92040.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the **Target Devices** described in Attachments A1 to A3 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile devices for evidence described below. The seizure and search of the cellular/mobile devices shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile device will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of August 28, 2022 to and including September 28, 2022:

a. tending to indicate efforts to possess and/or transport with the intent to distribute federally controlled substances within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the possession and/or transportation with the intent to distribute federally controlled substances within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in possession and/or transportation with the intent to distribute federally controlled substances within the United States;

d. tending to identify travel to or presence at locations involved in the possession and/or transportation with the intent to distribute federally controlled substances within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 18, United States Code, Section 2 and Title 21, United States Code, Sections 841 and 846.**

# AFFIDAVIT

I, Sean Bradley, being duly sworn, hereby state as follows:

## INTRODUCTION

1. This affidavit supports an application for warrants to search the following electronic devices (collectively, "**Target Devices**"):

   a. One Sky Devices blue cellphone (**Target Device 1**), as described in Attachment A-1 and incorporated herein by reference;

   b. One yellow Apple iPhone cellphone (**Target Device 2**), as described in Attachment A-2 and incorporated herein by reference; and

   c. One green Apple iPhone cellphone with a clear and glitter MagSafe cellphone case (**Target Device 3**), as described in Attachment A-3 and incorporated herein by reference,

and seize evidence of crimes, specifically Title 21, United States Code, Sections 841 and 846 (Possession of Fentanyl With Intent to Distribute and Conspiracy to do the same) and Title 18, United States Code, Section 2 (Aiding and Abetting) ("Target Offenses") as described in Attachment B. This search relates to the arrests of Kelly Banach and Joseph Jahner on September 28, 2022, in Lakeside, California, for possessing 853 fentanyl pills with intent to distribute. A factual explanation supporting probable cause follows. The **Target Devices 1** and **2** are currently in the custody of the Computer and Technology Crime High Tech (CATCH) laboratory at the Hall of Justice, 330 W Broadway, San Diego, California 92101. **Target Device 3** is currently in the custody of the San Diego County Sheriff's Department Lakeside Station at 12365 Parkside Street, Lakeside, California 92040.

2. The information contained in this affidavit is based upon my experience and training, consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the

1

information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

### EXPERIENCE AND TRAINING

3. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

4. I have been a Special Agent with the Federal Bureau of Investigation (FBI) since September 2004. I am currently assigned to the San Diego Field Division working as a member of the San Diego East County Regional Gang Task Force in El Cajon, California. My duties include the investigation and apprehension of individuals involved in violent gang-related activities as well as drug trafficking and distribution. Prior to joining the FBI, I was in the United States Marine Corps for 7 years.

5. I received sixteen weeks of training at the FBI Academy in Quantico, Virginia. During that training, I learned how controlled substances are manufactured, consumed, packaged, marketed, and distributed. Through my employment as an FBI Special Agent, I have become familiar with, and have participated in all the traditional methods of narcotics investigations, including, but not limited to: visual surveillance, questioning of witnesses, the use of search warrants, handling of informants and cooperating witnesses, pen registers, monitoring Title III interceptions, and undercover operations.

6. As an FBI Special Agent, I have performed or participated in various tasks which include, but are not limited to:

   a. Functioning as a surveillance agent and thereby observing and recording movements of persons, including gang members, trafficking in illegal drugs and weapons, and those suspected of trafficking in illegal drugs and weapons, including conducting surveillance in conjunction with tracker warrants;

    b. Tracing monies and assets gained by drug traffickers, including gang members, from the illegal sale of drugs and weapons (laundering of monetary instruments);

    c. interviewing witnesses, cooperating individuals, and informants relative to the illegal trafficking of drugs and distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments); and

    d. Supervising, as a case agent/co-case agent, specific investigations involving the trafficking of drugs and laundering of monetary instruments.

  7. As an FBI Special Agent, I have participated in approximately 100 arrests for narcotics-related and gang-related offenses. I have participated in over 20 investigations that involved various investigative techniques, such as undercover operations, the use of confidential informants, the purchase of controlled substances, the execution of search warrants, surveillance in connection with narcotic investigations, or interviews of confidential sources. Through training and participation in these investigations, I have gained valuable insight into the typical makeup and operation of drug trafficking organizations and the various methods these organizations use to carry out the distribution of controlled substances, including fentanyl.

  8. As a result of my training and experience, I know that drug traffickers and gang members communicate through the use of cellular telephones, including utilizing prepaid calling cards, direct connect (radio-to-radio), and texting capabilities. I also know that drug traffickers often change phones as a means to evade detection by law enforcement. Moreover, I know that drug traffickers get phones from third parties and/or oftentimes subscribe to them in fictitious names in order to mask the true identities of the individuals using the phones.

  9. Based upon my training and experience as a FBI Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking

investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a.    Drug traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b.    Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

    c.    Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

    d.    Drug traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

    e.    Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

    f.    Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

    g.    Drug traffickers and their co-conspirators often use portable Wi-Fi/hotspot devices. Wi-Fi hotspots are internet access points that allow the Drug traffickers to connect to a Wi-Fi network, which are "pocket-sized" mobile routers that allow the connection to the internet, via Wi-Fi. This allows the traffickers to make phone calls, via Wi-Fi from anywhere, and limit their personal/identifying data to be detected.

    h.    The use of cellular telephones by conspirators or drug traffickers tends to generate evidence that is stored on the cellular telephones, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

10.    Based upon my training and experience as a FBI Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that

4

cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I know based upon my training, education, and experience investigating these conspiracies that searches of cellular/mobile telephones yields evidence:

    a.    tending to indicate efforts to possess and/or transport with the intent to distribute federally controlled substances within the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in possession and/or transportation with the intent to distribute federally controlled substances within the United States;

    d.    tending to identify travel to or presence at locations involved in the possession and/or transportation with the intent to distribute federally controlled substances within the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On September 28, 2022, at approximately 7:09 p.m., San Diego Sheriff's Department (SDSD) Deputy Jonathon Young observed a black 2022 Dodge Ram truck bearing Texas license plate RXK8260 tailgating other vehicles on Wildcat Canyon Road

5

in Lakeside, California, which is in the Southern District of California. Tailgating is a violation of California Vehicle Code Section 21703. Dep. Young knows from his four years of working in Lakeside that Wildcat Canyon Road is a particularly dangerous road with numerous bends and blind curves. Dep. Young responded to numerous serious injury and fatal accidents on Wildcat Canyon Road, and knows from his experience that tailgating on this particular is especially dangerous.

12. Dep. Young conducted a records inquiry of the Dodge Ram track, which came back as being registered as a rental vehicle. Dep. Young continued to follow the truck until there was a safe location to conduct a traffic stop. Dep. Young then activated his overhead lights and sirens and conducted a vehicle stop on the Dodge Ram based on the tailgating vehicle violation. Dep. Young identified that driver of the Dodge Ram was Joseph JAHNER and the passenger was Kelly BANACH. Dep. Young asked JAHNER if he was on probation and JAHNER replied that he was on probation for evading. JAHNER was compliant with Dep. Young's commands to exit the vehicle. Dep. Young searched JAHNER's person pursuant to his valid Fourth Amendment waiver, with negative results. Dep. Young advised JAHNER that he was not under arrest but was being detained while the vehicle was searched. Dep. Young confirmed via records check that JAHNER had a current Fourth Waiver.

13. Dep. Young then escorted BANACH to step out of the vehicle so it could be searched pursuant to JAHNER's Fourth Waiver. Dep. Young asked BANACH if there was anything illegal inside the vehicle and she stated "no." During a search of the Dodge Ram, Dep. Young found a plastic bag containing approximately 853 M30 pills between the front driver's seat and the center console of the vehicle. Based on my training and experience, I am aware that M30 pills are typically found to contain fentanyl. I am aware that 853 pills is a quantity for distribution and not for personal consumption. Further search of the vehicle revealed **Target Device 1** in the passenger side cupholder of the center console, **Target Device 2** within the center console, and **Target Device 3** in a white purse with Louis Vuitton markings located on the floorboard directly in front of the center console.

6

14. BANACH and JAHNER were arrested on state charges, including Possession of Controlled Substances for Sale in violation of California Health & Safety Code 11351 and Transportation of Controlled Substances in violation of California Health and Safety Code 11352(A). BANACH and JAHNER were transported to the Lakeside Patrol Station. The **Target Devices** were seized by the San Diego Sherriff's Department. Both JAHNER and BANACH were separately read their *Miranda* rights in different locations at the station. JAHNER and BANACH independently elected to waive their rights and speak to agents. Both JAHNER and BANACH denied knowledge of the drugs in the vehicle.

15. Subsequently, investigators sent the 853 pills to the San Diego County Sheriff's Department Regional Crime Laboratory for testing and analysis. One pill was analyzed and determined to contain fentanyl. The net weight of the 853 pills was 92.1 grams.

16. Even though both JAHNER and BANACH denied knowledge of the pills post-arrest, I believe one or both of them was lying based on the value of the pills. I am aware from my training, experience, and conversations with other investigators that counterfeit M30 pills containing fentanyl can be sold in the San Diego area for approximately $10 per pill. Thus the 853 pills in the vehicle are worth approximately $8,540. I do not believe those pills would have been mistakenly or haphazardly abandoned in the vehicle given their street value. I believe that the value and quantity of the pills provides probable cause that those pills were knowingly possessed by BANACH and JAHNER with intent to distribute them. I therefore believe the **Target Devices** will contain evidence of narcotics trafficking, including potentially identifying additional co-conspirators and the source of supply of the 853 pills and locations relevant to the offense, such as stash houses.

17. I also know that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses, appointment dates, text messages, pictures and other digital information are stored in the memory of the **Target Devices** which may identify other persons involved in narcotics trafficking. Accordingly, based upon my

7

experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that information relevant to the narcotics trafficking activities of JAHNER and BANACH, such as telephone numbers, made and received calls, contact names, electronic mail (e-mail) addresses, appointment dates, messages, pictures, audio files, videos and other digital information are stored in the memory of the **Target Devices**.

18.  Finally, in my training and experience, drug trafficking conspiracies require intricate planning and coordination.  This often occurs days, weeks, or even months prior to the actual distribution event.  Coconspirators communicate with one another in efforts to ensure success in getting their valuable cargo to the distributor who will conduct end-user sales. In this case, I believe the coordination between BANACH, JAHNER, and others likely began at least one month before the September 28, 2022 arrest. First, the 853 counterfeit M30 pills containing fentanyl is a significant quantity. There is a level of trust established by transacting in hundreds of pills between the supplier and the distributors. Therefore, I respectfully request permission to search the **Target Devices** for evidence of the Target Offenses from August 28, 2022 to and including September 28, 2022.

## METHODOLOGY

19.  It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.  Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.  An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular/mobile telephones do not have hard

8

drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the devices manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

20. Following the issuance of this warrant, I will collect the subject cellular/mobile telephones and subject them to analysis. All forensic analysis of the data contained within the telephones and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

21. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN INFORMATION**

23. The United States is not aware of any prior attempts to obtain the information requested in this warrant by any other means.

**CONCLUSION**

24. Based on all of the facts and circumstances described above, there is probable cause to conclude that JAHNER and BANACH used the **Target Devices** to facilitate violations of the Target Offenses.

25. Because the **Target Devices** were promptly seized during the investigation of JAHNER and BANACH's state narcotics distribution arrests and have been securely stored, there is probable cause to believe that evidence of illegal activities committed by JAHNER

9

and BANACH continues to exist on the **Target Devices**. As stated above, I believe that evidence of the Target Offenses will cover the time period from August 28, 2022 to and including September 28, 2022

WHEREFORE, I request that the court issue warrants authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachments A-1 to A-3, and the seizure of items listed in Attachment B, using the methodology described above.

_____
Sean Bradley
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 26th day of October, 2022.

\_\_\_\_*William V. Gallo*\_\_\_\_\_
The Honorable William V. Gallo
United States Magistrate Judge

10